UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Rodney DeWalt, and
DeWalt CEO, Inc.,

Case No. 15-cv-4355 (PAM/KMM)

Plaintiffs,

v.

**MEMORANDUM AND ORDER**

The City of Brooklyn Park, Minnesota,
a Minnesota municipal corporation,

Defendant.
_____

This matter is before the Court on Defendant the City of Brooklyn Park's Motion for Summary Judgment. For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiff Rodney DeWalt is a black businessman who has been involved in the restaurant and nightclub industry for more than 30 years. (DeWalt Dep. (Docket No. 29-2) at 14-15.) DeWalt is the sole owner of Plaintiff DeWalt CEO, Inc. (Id. at 24-25.)

**A. "Gossip" and Creekside Plaza**

In May 2014, DeWalt moved to Maple Grove, Minnesota, intending to open an entertainment venue in the area called "Gossip." (Id. at 44-46; Shepherd Aff. (Docket No. 29-2) Ex. 12.) According to Gossip's business plan, guests would "not only have the ability to gather and eat, enjoy cocktails and socialize but also experience great entertainment." (Shepherd Aff. Ex. 12.) Gossip's anticipated competition was the Dakota Jazz Club and the Fine Line Music Café, which are located in downtown Minneapolis. (Id.) Gossip would have been open from 8 p.m. to 2 a.m. on Wednesday,

Thursday, Saturday, and Sunday, and from 6 p.m. to 2 a.m. on Friday. (Id.) Gossip would host DJs, comedians, and other live entertainment, and would require a cover charge for admission. (Id.)

DeWalt eventually identified a storefront (the "Property") in Creekside Plaza, a multi-tenant shopping center in the City of Brooklyn Park (the "City"), as a potential location for Gossip "due to a high population of African Americans" in the area. (DeWalt Dep. at 46; Am. Compl. (Docket No. 7) ¶ 6.) Creekside Plaza is bordered by 85th Avenue North to the south and Noble Parkway to the west. (Larson Aff. (Docket No. 31) Ex. 1.) Two churches are located on the other side of Noble Parkway. (Id.) Directly north and east of Creekside Plaza is a residential neighborhood. (Id.) Creekside Plaza's tenants include a gas station, a convenience store, a Chinese restaurant, a Papa John's Pizza, an Anytime Fitness, and a daycare center. (Sherman Aff. (Docket No. 30) Ex. 3.) The Property is located between the daycare center and the Anytime Fitness. (Id.)

Todd Larson, a senior planner for the City, informed DeWalt that Creekside Plaza was zoned for the type of use DeWalt was proposing, but that Larson would need more information about Gossip. Larson also informed DeWalt that he would need to apply for a Conditional Use Permit ("CUP"). (Larson Aff. ¶ 3; DeWalt Dep. at 83-84.)

On January 22, 2015, DeWalt executed a 10-year Lease Agreement with Creekside Realty Associates LLC to rent and occupy the Property. (Shepherd Aff. Ex. 21.) The Lease Agreement was contingent on DeWalt securing a CUP within 90 days of the Lease Agreement's execution. (Id.)

B.     The City Code

Creekside Plaza is zoned as a Planned Community Development District ("PCDD"). (Id. Ex. 18.) Only certain "Uses" are allowed in PCDDs, including certain "Conditional Uses" that require a CUP. See Brooklyn Park Zoning Code ("Zoning Code") §§ 152.415(C), 152.035. The purpose of a CUP "is to allow the City discretion in permitting certain uses in particular zoning districts that may be compatible with uses in the district or perceived public needs under certain circumstances." Id. § 152.035(A). When deciding whether to grant a CUP application, the City may take into account compliance with the City's Comprehensive Plan, traffic volumes, and parking and city services demands. Id. § 152.035(D). According to the City's Comprehensive Plan, Creekside Plaza is designated as a General Neighborhood Commercial land use. (Sherman Aff. Ex. 8 at 8.) A General Neighborhood Commercial land use includes "[r]etail, office, and personal service establishments that are oriented to residents of the immediate neighborhood." (Id. Ex. 8 at 5.)

A Class II Restaurant is a "Conditional Use" that requires a CUP. Zoning Code § 152.342.01. The Zoning Code defines a Class II Restaurant as an establishment that "serves food and is eligible for an intoxicating liquor license without a cover charge." Id. § 152.008. To be eligible for an intoxicating liquor license in the City, "[a]t the time of the initial license application . . . for a restaurant, the applicant must provide written documentation demonstrating that at least 25% of the restaurant's gross receipts are attributable to the sale of food." Brooklyn Park City Code ("City Code") § 112.048. The City's liquor license ordinance further defines "restaurant" as any establishment "having

3

appropriate facilities for the serving of meals . . . where meals are regularly furnished at tables to the general public and which employs an adequate staff to provide the usual and suitable service to its guests, and the principal part of the business of which is the serving of foods." Id. § 112.030. In addition, Minnesota's liquor license statute defines a restaurant as an establishment "where meals are regularly prepared on the premises." Minn. Stat. § 340A.101, subd. 25.

**C.     DeWalt's CUP Application**

On January 29, 2015, DeWalt participated in a pre-application meeting with Larson and other City staff. DeWalt provided the City with Gossip's business plan and the parties discussed Gossip's proposed menu. (Larson Aff. ¶ 5.) When DeWalt informed City staff that he expected 85% of Gossip's clientele would be black, DeWalt claims that "the look on their face was like huh-uh, no. And that's when I knew that this could be a problem." (DeWalt Dep. at 150.) The next day, DeWalt formally applied for a CUP to operate a Class II Restaurant on the Property. (Shepherd Aff. Ex. 11.)

At the City's request, DeWalt provided the City with a sample menu and kitchen-equipment list for Gossip. (DeWalt Dep. at 64-65.) The sample menu included hamburgers, nachos, tacos, pulled pork sandwiches, fries, and salads, among other foods. (Shepherd Aff. Ex. 19.) DeWalt also planned to have a catering company provide food. (DeWalt Dep. at 99.) The equipment list included a "counter-top convention oven (food warmer)," a hot dog broiler, nacho warmer, and a "soup kettle (cooker warmer)," among other kitchen equipment. (Compl. (Docket No. 1) Ex. G.) The equipment list did not

4

include a traditional oven or dishwasher, and the sample menu notes "All foods microwaved." (DeWalt Dep. at 66; Shepherd Aff. Ex. 19.)

On February 13, 2015, the City sent DeWalt a letter acknowledging that it received DeWalt's CUP application and informing him that Gossip did not qualify as a Class II Restaurant based on the City Code and DeWalt's proposed menu and equipment list. (Shepherd Aff. Ex. 13.) The City also informed DeWalt that a condition of approval would be "investing in a kitchen suitable for preparing and cooking [DeWalt's] desired menu." (Id.) DeWalt did not provide the City with a revised menu or equipment list, or any written documentation that Gossip would generate 25% of its gross revenue from food sales. (DeWalt Dep. at 64, 67, 95.)

As required by the CUP application process, DeWalt organized a neighborhood meeting to discuss his application. (DeWalt Dep. at 72; DeWalt Aff. (Docket No. 37) Ex. D.) The parties dispute whether City staff other than Todd Larson attended this meeting. (Larson Aff. ¶ 6.) DeWalt claims that once the neighbors understood DeWalt's proposal for the Property, they became racially hostile. (DeWalt Dep. at 77, 79.) According to DeWalt, neighbors stated, "you are not compatible," and chanted, "take it back to Maple Grove." (Id. at 79.) One neighbor said that she would not be able to get up to go to work if DeWalt's clientele were in the neighborhood. (Id. at 80.) DeWalt also claims that one of the leaders of the meeting was racially hostile because he stated, "If you are not going to put in a fine food establishment, you are not welcome here." (Id.) Other neighbors chanted, "We don't want no pat down." (Id.) When DeWalt said that 85% of Gossip's clientele would be black, neighbors responded, "Well, what are they doing over here?"

5

and "Well, we don't want it here." (Id. at 81.) Larson attended the meeting and disputes that the neighbors chanted or made any racially charged statements. (Larson Aff. ¶ 8.)

The City also received numerous letters from the public opposing DeWalt's CUP application. One letter is from the pastor at a neighboring church expressing his concerns about extra cars spilling over into the church's parking lot and Gossip's hours of operation during church youth activities and services. (Compl. Ex. H.) Other letters expressed concern over Gossip's close proximity to the adjacent neighborhood and the likelihood of noise and public drunkenness if Gossip were to open. (Id.) None of the letters discuss race. (Id.)

On April 8, 2015, the City's Planning Commission held a public meeting on DeWalt's CUP application. Larson spoke first, explained DeWalt's application, and informed the Planning Commission that City staff recommended denying the application because Gossip's business plan did not qualify it as a Class II Restaurant and because parking was inadequate. (Shepherd Aff. Ex. 7 at 3-4.) DeWalt's attorney then addressed the Planning Commission and insisted that Gossip would generate 25% of its gross revenue from food sales, and that parking was sufficient because of Gossip's hours of operation compared to other tenants in Creekside Plaza. (Id. at 5-6.) DeWalt also spoke and clarified that Gossip was not a "young hip-hop club," but rather a "25-and-over entertainment venue." (Id. at 8.) DeWalt indicated that Gossip would bring jobs to the African-American community and provide a "venue for African American people where they can have a place where they can come, socialize, talk and be entertained, no hip-hop, no young folks, all grownups." (Id.)

6

Twenty-six members of the public then addressed the Planning Commission, many of whom lived in the residential neighborhood directly next to Creekside Plaza. (See generally Shepherd Aff. Exs. 7, 9.) The second person to speak lived directly behind Creekside Plaza and stated:

> When I bought the house, I didn't buy a house to have my wife and kids laying down trying to go to sleep. And when all them other restaurants and stuff is closed and I'm sitting on my couch with my family and kids at nine o'clock or ten o'clock at night, I don't need to hear any music. I don't need to hear any argument, any loitering or anything else. So I'm opposed to it. I'm all for African American, more jobs. I'm African American, might be a shock. But I'm totally opposed to a nightclub and I'm literally directly right—I look out my big bay window, that nightclub is right there. So I'm opposed to it.

(Shepherd Aff. Ex. 7 at 12.) A former Minneapolis police sergeant also addressed the Planning Commission and stated, "I have a problem with a statement that if Brooklyn Park is not in favor of this, that we're bigots and racists. I didn't get the memo and I am African American." (Id. at 24.) The rest of the public comments focused on the potential negative effects of Gossip near a neighborhood and churches, and the possibility of increased traffic, noise, and crime. (See generally id.) Following public comment, the Planning Commission voted to recommend denying DeWalt's CUP application to the City Council. (Shepherd Aff. Ex. 26 at 6.) The day after the Planning Commission meeting, DeWalt terminated his lease with Creekside Realty Associates LLC. (Shepherd Aff. Ex. 22.) DeWalt, however, maintains that if the City Council would have approved his CUP application, the lease would have been in effect. (See Compl. Ex. I.)

On April 28, 2015, the City Council considered DeWalt's CUP application. During the City Council meeting, DeWalt indicated that "this location would never

work" and that he has been "harassed from day one" with "racist" letters. (Shepherd Aff. Ex. 8 at 5.) DeWalt further stated that "we're just going to go ahead and pursue our legal rights and move on." (Id. at 5-6.) DeWalt, however, did not formally withdraw his application. (DeWalt Dep. at 162-63.)

The City Council adopted Resolution #2015-88, and denied DeWalt's CUP application. (Shepherd Aff. Ex. 18.) The Resolution made six conclusions: (1) Gossip was not compatible with the nearby residential neighborhood; (2) Gossip was not compatible with the City's goal to create a positive image and ensure stable neighborhoods; (3) Creekside Plaza's parking was insufficient for Gossip's parking needs; (4) Gossip did not meet the purpose and criteria for a CUP set forth in the City's Zoning Code § 152.035; (5) Gossip was a nightclub and a nightclub does not meet the "Neighborhood Service Center" criteria in the City's Comprehensive Plan; and (6) Gossip did not qualify for a liquor license under either state law or city ordinance because Gossip did not meet the definition of a restaurant. (Id.)

**D.  Procedural Posture**

On December 14, 2015, DeWalt, proceeding pro se, filed this lawsuit under 42 U.S.C. §§ 1981 and 1983 alleging that the City violated his First and Fourteenth Amendment rights by discriminating against him on the basis of his race when it denied his CUP application. DeWalt eventually obtained counsel and filed an Amended Complaint on April 25, 2016. Although not a model of clarity, DeWalt's Amended Complaint raises five claims. The first three are § 1983 claims for violations of the First Amendment, and the Fourteenth Amendment's Equal Protection Clause and Substantive

8

Due Process Clause. The fourth is a § 1981 claim for interference with a business contract. The fifth is a claim for violations of the Minnesota Human Rights Act. Following the close of discovery, the City filed the instant Motion for Summary Judgment and argues that DeWalt lacks standing and has not provided sufficient evidence of discrimination in any event.

**DISCUSSION**

**A.      Standing**

Article III of the United States Constitution confines federal courts to adjudicating actual "cases" or "controversies." U.S. Const. art. III § 2, cl. 1. To meet this Constitutional requirement, a plaintiff must have standing. The question of standing "is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). To show Article III standing "the plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." Pucket v. Hot Springs Sch. Dist. No. 23–2, 526 F.3d 1151, 1157 (8th Cir. 2008) (quotations and citation omitted). The plaintiff must show that he "sustained or is immediately in danger of sustaining some direct injury as the result of the challenged . . . conduct and [that] the injury or threat of injury [is] both real and immediate." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983) (quotations and citation omitted).

The City argues that DeWalt did not suffer an injury in fact because he did not have an interest in the Property at the time the City Council denied his CUP application.

9

(Def.'s Supp. Mem. (Docket No. 28) at 18.) Although it is true that DeWalt terminated the lease agreement—and the lease agreement expired on its own terms—before the City Council denied DeWalt's CUP application, DeWalt provided evidence that the lease agreement would have been in effect had the City Council approved his CUP application. (Compl. Ex. I.) DeWalt has therefore met his burden of proving that he suffered an injury in fact because the City's decision to deny DeWalt's CUP application, allegedly because of DeWalt's race and the race of Gossip's anticipated clientele, prevented him from opening Gossip. DeWalt has standing.

**B.     Summary Judgment**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

   **1.     42 U.S.C. § 1983**

Section 1983 provides a federal cause of action against anyone who, acting under color of state law, "violates any 'rights, privileges, or immunities secured by the

Constitution and laws' of the United States." Pediatric Specialty Care, Inc. v. Arkansas Dep't of Human Servs., 293 F.3d 472, 477 (8th Cir. 2002) (quoting 42 U.S.C. § 1983). Section 1983 "is not itself a course of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Albright v. Oliver, 510 U.S. 266, 271 (1994) (citation and quotations omitted).

      a.      **Equal Protection**

Although it does not mention the words "equal protection," the gravamen of DeWalt's Amended Complaint is the allegation that the City discriminated against him on the basis of his race and the race of Gossip's anticipated clientele in violation of the Equal Protection Clause of the Fourteenth Amendment. To establish an equal protection violation, DeWalt must provide evidence of a "racially discriminatory intent or purpose" on the part of the City. Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977). "Discriminatory purpose can be proved with various kinds of direct and circumstantial evidence but is most often proved with evidence that similarly situated [individuals] were treated differently." Lewis v. Jacks, 486 F.3d 1025, 1028 (8th Cir. 2007). The sequence of events leading up to the City's decision and any departures from regular procedure may also indicate discriminatory intent. Arlington Heights, 429 U.S. at 267-68.

DeWalt concedes that he has not provided any direct evidence that the City discriminated against him on the basis of race. (Pls' Opp'n Mem. (Docket No. 34) at 21, 29.) And the only circumstantial evidence of discrimination is DeWalt's testimony that City staff members gave him a bad look when he told them that 85% of Gossip's clientele

11

would be black. But even assuming its truth, this lone allegation is insufficient to prove that the City acted with any racially discriminatory intent or purpose when it denied DeWalt's CUP application.

Almost all of DeWalt's allegations of racial bias are made against neighbors or members of the general public, not the City. But these allegations fail to establish an equal protection violation for two reasons. First, DeWalt's allegation that neighbors at the Planning Commission meeting "used exaggerated speech to spew hostile, racially charged rhetoric" is simply false. (Pls.' Opp'n Mem. at 7.) The people who spoke at the Planning Commission meeting expressed their concern about an entertainment venue that served alcohol and was open until 2 a.m. being located next to a residential neighborhood and two churches. These concerns included noise, loitering, increased traffic, and extra garbage. (See generally Shepherd Aff. Ex. 7.) The only time people mentioned race was to respond to DeWalt's initial comments. (See, e.g., id. at 18.)

Second, even assuming that neighbors made racially charged remarks at the initial neighborhood meeting and sent DeWalt racist letters, (see DeWalt Aff. ¶ 14), DeWalt does not provide any evidence that the City adopted the neighbors' racial animus. Instead, DeWalt makes two unsubstantiated allegations that the City's website displayed a link to a neighbor's website that contained a "countdown" to the Planning Commission meeting, and that one additional City Council member attended the neighborhood meeting. (DeWalt Aff. ¶¶ 11, 16.) But absent any evidence that the City council member adopted, relayed, or endorsed the alleged racial bias to the rest of the City Council, or any evidence that the neighbors' website included any racial animosity, these allegations do

12

not provide evidence that the City adopted any neighbors' racial bias, and are insufficient to withstand summary judgment. See Contreras v. City of Chicago, 119 F.3d 1286, 1294 (7th Cir. 1997) (affirming summary judgment because plaintiff failed to provide evidence that government officials adopted their constituents' racial animosity).

DeWalt also fails to provide any evidence that the City treated him differently than other similarly situated individuals. The only record evidence of how the City treated other CUP applicants is the City's answer to Interrogatory No. 11, in which it lists twelve previous CUP applicants, the type of facility they sought to open, the address of the facility, and whether the City granted or denied the application. (Shepherd Aff. Ex. 6 at 4.) Although DeWalt relies on this evidence to claim that in the past 10 years the City has granted every non-black person's CUP application, while it has denied every black person's application (DeWalt Aff. ¶ 21), the City's answer does not list the applicants' race and the City does not request or keep track of a CUP applicant's race. (Shepherd Aff. Ex. 6 at 4, 6.) DeWalt also previously admitted in his deposition that he does not know the race of the previous CUP applicants besides one black applicant named Eugene Roques. (DeWalt Dep. at 207.) Curiously, DeWalt concedes that he was not similarly situated to Mr. Roques. (Id. at 145.) But even assuming Mr. Roques and DeWalt are similarly situated, the City denied Mr. Roques's CUP application for the same non-race related reasons they denied DeWalt's CUP application: an entertainment venue that serves alcohol and is open until 2 a.m. is not compatible with a nearby residential neighborhood. (See Shepherd Aff. Ex. 24 at 2-3.) Moreover, contrary to DeWalt's claim, the City has approved a black person's CUP application and has denied a non-

13

black person's CUP application. (Sherman Aff. ¶¶ 6, 9.) Based on this record, there is no evidence that the City treated DeWalt differently than other similarly situated CUP applicants.

Nor is there any evidence that the City departed from its regular procedures when it denied DeWalt's CUP application. To the contrary, the sequence of events leading up to the City's decision shows that the City did not deny DeWalt's application because of any discriminatory intent. From the beginning, Larson informed DeWalt that the City required him to obtain a CUP to operate Gossip on the Property. DeWalt does not dispute that, as part of the CUP application process, the City requires the applicant to attend a pre-application meeting, initial neighborhood meeting, Planning Commission meeting, and City Council meeting. After the pre-application meeting, the City informed DeWalt that he would need to invest in more kitchen equipment if he wanted his CUP application to be granted. DeWalt, however, did not provide the City with any updated information. (DeWalt Dep. at 64, 67, 95.) After the rest of the required meetings, the City denied DeWalt's CUP application and provided detailed, non-race related reasons for the denial. (Shepherd Aff. Ex. 18.)

DeWalt argues that some of the City's reasons for denying his CUP application are pretextual. First, DeWalt argues that Gossip did qualify as a Class II Restaurant under the City Code because 25% of Gossip's gross revenue would have come from food and food would have been regularly prepared on Gossip's premises. (DeWalt Aff. ¶ 24.) But when the City asked DeWalt to show how he would meet these requirements, DeWalt failed to respond. The City's decision to deny DeWalt's application for this

14

reason was therefore not pretextual. Second, DeWalt claims that Creekside Plaza contained sufficient parking for Gossip. Besides DeWalt's claim, however, the record is completely devoid of any evidence, such as the Property's square footage, that could help the Court determine whether parking was sufficient and the City's reason was pretextual. Finally, DeWalt argues that Gossip was compatible with the nearby neighborhood because the City's black population exceeds 35% and DeWalt intended to keep Gossip safe, clean, and quiet. DeWalt further argues that the City's use of the term "compatible" is a euphemism for racial discrimination and conceals the City's view that black people are noisy, messy, disruptive, and violent. But DeWalt ignores the fact that compatibility is a required metric when evaluating a CUP application under the City's Comprehensive Plan. See Zoning Code § 152.035(A). And contrary to DeWalt's claims, the City's concerns about Gossip's compatibility with the neighborhood have nothing to do with race. The City was rightfully concerned with potential problems that an establishment like Gossip—that serves alcohol, hosts live entertainment, and is open during church activities and until 2 a.m. on school nights—brings to a community, regardless of the race of the establishment's anticipated clientele.

Absent any evidence of pretext, discriminatory treatment, or discriminatory intent, DeWalt's equal protection claim fails.

### b. Substantive Due Process

In the zoning context, a plaintiff asserting a substantive due process claim must establish that the zoning authority's decision was "truly irrational." Koscielski v. City of Minneapolis, 435 F.3d 898, 902 (8th Cir. 2006) (citation omitted). As previously

discussed, the City did not deny DeWalt's CUP application because of his race or the race of Gossip's anticipated clientele. Rather, the City denied DeWalt's CUP application because Gossip, an entertainment venue that would have served alcohol and been open until 2 a.m., was not compatible with a nearby residential neighborhood. That decision was a quintessential example of rational decision-making. DeWalt's substantive due process claim fails.

      c.     **1st Amendment**

DeWalt alleges that the City violated his "right to free speech and expression guaranteed by the First Amendment: included is the right to artistic expression through music and offer musical events without restrictions based on content and/or viewpoint." (Am. Compl. ¶ 28.b.) He further alleges that he has "a protected right to freely associate as guaranteed by the First Amendment which includes the right to associate with others regardless of race." (Id. ¶ 28.c.) These bare-bones allegations are left largely undeveloped in DeWalt's opposition memorandum. In fact, DeWalt's opposition memorandum includes only one paragraph on his First Amendment claim, and that paragraph abruptly ends mid-sentence. (Pls.' Opp'n Mem. at 23-24.) Presumably, DeWalt has abandoned this claim. But even if he has not, DeWalt's First Amendment claim fails.

The First Amendment does not explicitly protect a general right of association, but the Supreme Court has recognized that it "embraces such a right in certain circumstances." City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). These circumstances include a person's right to "enter into and maintain certain intimate human relationships"

16

and a person's right to engage "in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." Roberts v. United States Jaycees, 468 U.S. 609, 617-18 (1984). The Supreme Court has previously held that activity of "dance-hall patrons—coming together to engage in recreational dancing—is not protected by the First Amendment. Thus this activity qualifies neither as a form of 'intimate association' nor as a form of 'expressive association.'" Stanglin, 490 U.S. at 25. Simply put, the Constitution does not recognize a generalized right of "social association." Id.

Like the dance-hall patrons in Stanglin, DeWalt does not enjoy a First Amendment right to socially associate and listen to music at Gossip. Although DeWalt now claims that Gossip was intended to be a place where the black community could gather and discuss social issues like voter registration (DeWalt Aff. ¶ 3), the record belies this desperate attempt to save his meritless claim. (See, e.g., Shepherd Aff. Ex. 12.) DeWalt's First Amendment claim fails.

### 2. 42 U.S.C. § 1981

Section 1981 protects the right of all individuals to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). The parties agree that the Court should examine this claim under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, DeWalt must first establish a prima facie case.

Specifically, he must present evidence that he was in a protected class, that the City intended to discriminate against him on the basis of race, and the discrimination interfered with the enforcement of the contract. See Harris v. Hays, 452 F.3d 714, 718 (8th Cir. 2006). Again, DeWalt has failed to present any evidence that the City intended to discriminate against him on the basis of race. His § 1981 claim therefore fails.

### 3. The Minnesota Human Rights Act

DeWalt brings three claims under the Minnesota Human Rights Act alleging that the City racially discriminated against him in various ways. See Minn. Stat. §§ 363A.12, 363A.15(2), and 363A.17. Because the City did not discriminate against DeWalt on the basis of his race, these claims fail.

## CONCLUSION

DeWalt has failed to provide sufficient evidence that the City discriminated against him on the basis of his race or the race of Gossip's anticipated clientele. Accordingly, **IT IS HEREBY ORDERED that:**

1. The City's Motion for Summary Judgment (Docket No. 26) is **GRANTED**; and

2. DeWalt's Amended Complaint (Docket No. 7) is **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: May 17, 2017

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge